Good morning, ladies and gentlemen. This is the time set for argument in the hearing on bank of the case of Hayes v. Woodford. We understand that counsel are present and ready to proceed, and so counsel for the appellant should proceed. May it please the Court. My name is David Senior. I represent Bluford Hayes. Deputy District Attorney Terry Van Oss believed that the need for the unimpugned testimony of Andrew James was so important that he lied to the trial judge, telling him that James was getting no deal for dismissal of two felony charges in exchange for his testimony. Deputy District Attorney Terry Van Oss believed that the need for the unimpugned testimony of Andrew James was so important that he lied to defense counsel, telling him that James was getting no deal for dismissal of two felony charges in exchange for his testimony. Again, Terry Van Oss believed that presenting the unimpugned testimony of Andrew James was so important to his case that he presented false evidence asserting the absence of a deal. On direct, he sat quietly with his arms folded on cross-examination while the false evidence was presented a second time. And then on the third time during redirect examination, he presented the false evidence again. Well, you characterize it as false evidence, but technically it was not perjurious because, as the record shows, James had no knowledge with regard. So he didn't testify untruthfully, did he, Mr. Senior? The test in the pew is the presentation of false evidence. It is not the presentation of perjury. So you would agree that James' testimony was not false, as he gave it? I would say that James' testimony was absolutely false. How? James testified that he was getting no deal in exchange for the two pending felony charges. And that's false. And he had no notice or knowledge of that at the time he said that, did he? That's false evidence. That's not answering my question. Did the witness know at the time he answered the question that he was getting more than immunity for the crimes plus the witness protection program and the other concessions that the jury did hear about? I will answer that question. Yes, he did know. How? Because he was given a round-trip plane ticket from Florida to travel to Stockton to testify against Bluford Hayes with the knowledge, and was told by Officer Wingo, that he could get right back on the plane and return back to Florida without having to face charges. Don't we have a finding by the magistrate judge that that did not constitute knowledge on the part of the witness? I mean, this is an argument that you made to the district court, which was rejected, is it not? Well, as far as findings go by the magistrate, there's never been an evidentiary hearing if this is an important issue as to whether James knew. And if there was an evidentiary hearing as to whether James knew, that's one fact that seems to make an inference that James knew that he didn't have to stand charges. The other fact that seems to indicate that James did not have to face his charges is two years after being charged, he still hadn't been arraigned for the charges. He knew what was going on. Now, what transpired in the district court is the Petitioner made a motion for summary judgment asserting those two facts. And under Selatex, the Attorney General then has an opportunity to challenge those two facts, that the inference is that James knew about the deal. And what the Attorney General did in response is presented no evidence. So as to what transpired in the district court, all the inferences should be in Petitioner's favor. The AG can't sit back and do nothing, which he did, and therefore the inference is that James knew of the deal. Well, let's assume that the findings are unimpeachable, that James didn't know. Is that the end of your case? No. Because James – it's not important what James knew. What's important is what the jury knew. And what the jury knew is that he was getting no deal. All right. So if the jury knew that he had lied on the stand, that would be one thing. And that's the way a lot of these come up, in the fact that the witness does know he's got a deal and he lies, therefore his credibility is at issue. But on the facts of this case, as I'm asking you to assume, James isn't lying. He's misstating the fact. The fact is there has been an offer, but he's not party to that under my assumption. Is – where is then the constitutional violation if only the prosecutor knows that it's not true? Two parts. It's the presentation of false evidence, and that is as follows. Here's the baseline for the prosecution of good evidence. Here's really good prosecution evidence. James testifies, I got a confession for homicide. Better evidence for the prosecution. James testifies, I got a confession to burglary. Gets better. James now testifies, I'm not getting a deal in exchange for my testimony. That gets to be the best. That's the evidence that's in front of the jury. As opposed to, I got a confession for homicide, I got a confession for burglary, I'm getting the dismissal of two pending felony charges in exchange for my testimony. The false evidence that is in front of the jury, and what was considered by the jury, is better than the evidence that if he told the truth, or alternatively, if Deputy District Attorney Banos corrected the testimony, which he was obligated to do. Didn't he give – didn't James give two prior consistent statements, the same story, basically, before this deal was made to dismiss the other felonies? No. And I think that's one thing that's been found. I thought that the evidence of when the deal was made was at about the time of the hearing from the attorney's notes, but he had made statements at an earlier time. Well, here's the chronology of events. January 1, the homicide takes place. January 1, James knows that he is a suspect. He knows he saw someone seeing him leave the scene, and when he called the police, the police told him they had a witness of someone watching him leave the scene. So he knows he is potentially on the hook for a homicide, for a burglary, for accessory charges. On the 6th of January, it's reported that he talked to the police. No statement was taken. Nothing in James' handwriting. No court reporter took anything down. Nothing was recorded on the 6th. Did the investigating detective make a report of that interview? January 29, after James was picked up on charges on January 8 and January 16, and after James sat down on the 16th when he was arrested and gave a statement with a court reporter taken by the DA with the police officer, Sergeant Wingo, sitting there taking the statement. That statement was taken at 8.15 or 8.45 on the 16th in the evening after they had arrested James and charged him with felonies. So as I understand your answer, Sergeant Wingo did prepare a report of his interview on January the 6th, but it wasn't until quite late. It was three or four weeks after the 6th, and it was two weeks after he sat there and listened to a court-reported statement being taken from James. Now, on the 16th, James is concerned that he's going to get charged with homicide, burglary, accessory to burglary, and now he's got two pending felony charges that he just picked up on the 16th, as well as he had a probation violation, or he was on probation. He had a five-year state prison sentence, suspended sentence for felony burglary that he's sitting there looking at on the 16th. He gives the statement fingering Hays on the 16th. So with all those motives to place the blame on Hays. Now, on the 7th... When did he get the deal? The deal... What does the record show as to when he got the deal that his other felony, unrelated felony charges would be dismissed? The same day that he got immunity, February 7th. So that's after a statement on the 16th. Right, but... So get back to my first question. Didn't he make two prior consistent statements with his trial testimony before he had this deal? He made two... I'm not saying you couldn't impeach him on other grounds, but didn't he make two prior... He made two statements before he got the deal when he had the motive to finger Hays. Okay. Well, then, if you had just answered my question yes at the start, I think, you know, I would have had what I needed to know. I'm sorry. Counsel, help me with something else about James. As I understood it, James wasn't really very important to fingering Hays for the murder. The real evidence of the blood and so forth was critical on that. Also, Hays admitted that he killed the victim. He just said that it was self-defense, basically. It looks like what's important about James is that he says that Hays stole the cigarettes from the victim's motel office. Is that correct? That is correct, and that is a very important part of James' testimony. So it's not the murder, it's the burglary. Well, a confession like no other evidence is the most damaging to the defendant. I don't know what defense counsel would have done. So you're saying once Hays says, yes, I killed Patel, that's the end of it on who killed Patel. There's no way of hanging it on James anymore. In the defendant's case, I'm not sure whether Hays would have testified but for James' testimony that he got a confession to the homicide from Hays. Wait, are you saying that Hays was misled into saying that he killed Patel just because James, he didn't know James had a deal? No, what I'm saying, okay, let me back up a second. If Hays is not convicted of burglary and the burglary special circumstance, he's not death penalty eligible. Okay, that backs us up to where I was a question ago. All right. What James is important for is not the murder, it's the special circumstance of burglary. Right? Yes. Okay. Now, on the burglary, I guess what you'd have to do is show that Hays really made a difference as opposed to the prosecution theory of why else would Hays lure or why else would Hays lure Patel down to his room with the sink story? What about the other witness who says, who corroborates the cigarette story? Is the other evidence enough so that the jury would have believed the special circumstance of burglary regardless of James? Is that the question for us? The question, if James' testimony is disregarded, there's no evidence that Hays did the burglary. I thought there were two pieces of evidence at least. Another witness who says that she saw Hays put the cigarettes in the car and also the circumstantial evidence of Hays luring Patel down to his room. There's no evidence of Hays luring Patel down to the room. Hays advised Patel that there was a leak in his sink. There's no evidence that there wasn't a leak in his sink. Was there a leak in his sink? There's no evidence that there was a leak in his sink or that there wasn't a leak in his sink. Well, the jury was perfectly free to disbelieve everything Hays said just like any other witness, wasn't it? And the only evidence for the leak in the sink is that the guy who killed Patel says there was or told Patel there was. No, there was a witness that came into the hotel or motel office, manager's office, that saw the conversation about Hays reporting a leak in the sink. But that doesn't mean there really was a leak. It just means that Hays was really in the office telling Patel there was a leak. Right. Can I have a question that relates to a point that Judge Kleinfeld was asking you about? Because I wanted to be clear what the evidence is on this point. Michelle Gebert's testimony on the question of the burglary special circumstance, she didn't testify that she saw the burglary or that Hays told her. As I understand it, she testified that she got that information from her boyfriend, James. Now, which is correct? That is correct. Gebert testifies in the transcript, page 2562, that she never saw Hays with cigarettes or money. Gebert testifies three times that A.J. told her that Hays ripped off the office. And on two times, the district attorney attempts to rehabilitate her to get her to say that she heard it directly from Hays. The first three times out of her mouth without attempting to be rehabilitated by the D.A. are, I heard it from A.J. But we do have the testimony from Bertha May Wyatt, who saw him carrying a box to the car after the murder. Page 267576, Bertha May Wyatt testifies that she saw James carrying something in the parking lot to his car. A lot of commotion back and forth, seemed like James was moving out. But she didn't say that she saw Hays. James. Sorry, could you give me that page number again? 267576. So there's no testimony by Wyatt that she saw Hays carrying anything to the car. She saw them. And he's she I think she testified that she saw him in the parking lot. But there's no testimony that she saw that Wyatt saw Hays carrying a box. I don't believe so. OK. Could you address if we're not going to pursue this line anymore? Could you shift over to the question of investigation on the penalty page and explain what it is that you think an investigation would have turned up? If counsel had disregarded Hays statements not to talk to the family. Well, the this this is the information that was at trial counsel's disposal to follow through on the. Hays started drinking at 12, had was suffering from DTs by age 17. Heroin addict, Ritalin user. Had been examined. And he would have been aware from the probation reports alone. He would have been aware that he'd been examined by four psychiatrists, Dr. Lee, Dr. Adams, Dr. Cavanaugh and Dr. Addis. He would have been aware if he had looked at his school records that from ages seven to 12, he's had all D's or S's, which was not satisfactory. If you see the chart at the top, it was slow progress. They were the worst grades available at Nightingale Elementary School. He would have seen that Hays had all F's by age 14 and had failed out of school. He would have seen probation officer report Broderson, Morris, Shepard and Fernandez, all who had mitigating insights about Petitioner, including that his violence was as a result of drinking, that his home was known as a shooting gallery, shooting as in heroin. That his siblings had substantial mental disorders with suicide attempts. That there was parental evidence of alcoholism and heroin abuse. All of these things could have been examined. Certainly a mental health examination alone would have been telling as to what the root cause is. It's one thing to know that someone's an alcoholic, someone's a heroin addict, but the bigger question is why are they? Now, so if we were to agree with you on your first point, would we ever need to reach this issue at all? I think he would be entitled to a new trial on the 14th Amendment violation of the presentation of false evidence. So this would pass out of the picture presumably because there would be a whole new trial. Exactly. If we would agree with you. Exactly. Could you just clarify one thing for me with respect to that mental health examination? Did the trial counsel ask the disappointed judge for funds for such an examination or did he not ask for anything? The Superior Court judge? Yeah. No, his testimony in a declaration is once Hayes told him that he didn't want his family involved, he quit investigating. There's an important point that I want to make on that, and this is in our brief on the first claim that we address in our brief. Trial counsel spent 2.7 hours with Bluford Hayes. That's it. Was there a whole lot of lawyers before trial counsel? Didn't Hayes go through several lawyers? Hayes had other lawyers before trial counsel. So presumably Hayes' lawyer at trial had a file. Is there any reason to doubt that he had a file? He had a file of a prelim and then a second prelim. Plus whatever those lawyers had done in the way of interviewing the defendant. I don't know what was in their file as far as interviewing the defendant or preparing mitigation evidence. And there's no evidence that there was anything in Talman's file, his file and everything else that was given to him, of mitigation evidence. Was there a finding that the records were not, the time records were not complete? There is no finding by the district court that the time records were not complete. Where did our panel get that? Do you think they just made it up? No, I believe they got it from the Attorney General's brief. Okay, from an argument. Yes. Didn't Hayes' lawyer refer Hayes to the forensic psychiatrist that Hayes' lawyer knew and had confidence in? The affidavit that was prepared by trial counsel is that he was submitted to a psychiatrist, Dr. Kavanaugh, for the examination for defense, for defenses only, guilt phase defenses only, namely diminished capacity. I think he was concerned that after being up 72 hours without any sleep, shooting heroin three times in 12 to 14 hours before the crime, downing a bottle of brandy, going and buying a bottle of Thunderbird wine and drinking it and shooting Ritalin within the 12 hours before the crime, whether there was a diminished capacity defense. And that's what his declaration says. And I can give you the, I employed a psychiatrist, Gary Kavanaugh, to examine Petitioner and to advise me as to the availability of a defense based upon Petitioner's mental condition. That's in the Attorney General's supplemental excerpt of record, page 9, colon 11. Was all of that before the jury? All of Kavanaugh's examination? All of the shooting of drugs and the drinking just before the crime and all of that. There was, well, I believe Hayes does attest to all of those things in getting the, he also says he felt normal. And I'm not sure what that normal is, but it certainly wouldn't be normal like the rest of the world feels normal. And that information alone, I believe, would be grounds for counsel to be investigating mitigation evidence, whether or not it rises to the level of diminished capacity and a defense at the guilt phase. It certainly is mitigating evidence that would require an investigation. But backing up for a second, when I said that Talman spent 2.7 hours total with Hayes, that was on the day and the day after he was appointed to represent him. Ten months later, the trial began. So he did no investigation. He didn't even talk to his client to know what might be out there. He never retained an investigator to look at mitigation. He never retained a mental health counselor. He never retained anyone to do social history examination. He never looked into all of these things which are obvious leads before him that need to be investigated. I'm sorry. I don't. What happened to his request for funds to present the expert on the diminished capacity? Kavanaugh looked at them, and they had a conversation. And it's recorded in Talman's timesheets that he spent 6 minutes one time and 12 minutes another discussing the case with Gary Kavanaugh. And then Kavanaugh testified at trial about a Ritalin disorder, but he never connected anything to Hayes. It was kind of a hypothetical. What is an informative? What's a Ritalin disorder? Does it make you paranoid? And that type of thing. You're just assuming that with further investigation, things would have gotten better. But the facts that you just recited are entirely consistent with Dr. Kavanaugh telling Hayes' attorney, sorry, there's nothing here that I can say in favor of Hayes specifically. With respect to a guilt phase defense? With respect to anything. No, it's not consistent with that. Just because somebody commits a cold-blooded murder doesn't mean that there's something mitigating that you can say for them. Just because someone commits a cold-blooded murder does not mean there's something mitigating you can say to them? That's right. Yes, absolutely, there's plenty of mitigating evidence that would be available to say on his behalf, both with respect to what his mindset was at the time. Let me explain where I'm coming from on this. In the Supreme Court decision that goes your way, Wiggins, it follows the usual model. There's nothing mitigating at trial, and then on the habeas petition, there's this mountain of powerful mitigating evidence presented with the petition to show what the lawyer could have presented at trial had he done the proper investigation and preparation. In your case, I don't see that there is. All I see is the assumption that if a person commits a crime like this, there must be something wrong with him. If someone commits a crime like this, there must be something wrong with them. That's not the issue that needs to be before the jury. Let me tell you the issue. You're playing with my question, and you're not understanding what I'm getting at. The model in Wiggins is trial with no mitigation, habeas petition showing a mountain of mitigation that could be presented, appellate relief. Here, trial with little mitigation, and then no mountain of mitigation evidence with the habeas petition. Okay. And I understand that point. Here's one thing that I want to bring to your attention, and then I'd like to reserve just a couple minutes for rebuttal. The petition was filed, in this case, August 23, 1995. Three weeks later, September 12, 1995, and excerpt of the record 52, we were ordered that we could not make a request for investigative funds. We were ordered that we could not make a request to do discovery. We have received zero dollars to do any investigation into the mitigation evidence in this case. Now, I can give you the facts, and I can cull the facts from the record to say there is a basis to go conduct an investigation, but I am not an expert, either a social historian, a psychiatrist, a psychologist, learning disability expert, or anything, where I can take that and analyze that evidence, discuss it with a petitioner, and bring you the mountain of evidence. So what you're saying is, yes, it's true, we don't have a mountain of mitigation evidence like Wiggins, but that's because the Court erroneously denied us money to investigate. And I want to make no, I'm not saying that. If I make a request for investigative funds to look into this, and the Court uses its discretion and says, no, I've looked at your request, I look at what you want to do, in my discretion, you're not getting any funds, that is challenged on an abuse of discretion. There was no discretion used here. We were precluded from even asking. The judge never thought, oh, maybe that's a basis to go look for something. Maybe that's a basis to give you money to go retain an expert and create this mountain of evidence, or not, from the leads that are clearly in the record before us. Where did the $210,000 go? The $210,000 that's bandied about and thrown out went as follows, and a brief summary here. We filed a petition containing 63 exhaustive claims. Knee-jerk reaction, Attorney General files motion to dismiss numerous claims as being procedurally defaulted. Briefing, briefing, briefing. Written to this Court, AG loses. We're back to square one again. Then the Attorney General makes a summary judgment motion after all 63 claims. So is the short answer that it went to attorney's fees and not to investigation? Absolutely. With the exception, footnote, during the course of these, the briefing on the summary judgment, the Court, without request by us, ordered evidentiary hearings on Claim 47 and on Claim 61 where there were monies allowed for those two particular issues. One, his failure to be present at the defense, or the penalty phase, the trial. And the second one was on the plea bargain. So there was an expert for his failure to be present at the penalty phase. All right, Counselor, if you want to reserve some time. Thank you. We'll give you two minutes on rebuttal. Thank you. May it please the Court, I am Matthew Chan here on behalf of the Respondent. With respect to the issue of whether or not James knew of the deal. Excuse me, Counsel. Could you talk a little louder? I'm having trouble hearing. I'm sorry, Your Honor. With respect to whether or not James knew there was a deal, District Court Judge Levy made finding a fact that James did not know of any deal between the prosecution himself for any leniency towards pending cases that he had. I thought Judge Levy said that the evidence strongly suggests. I don't think he made an affirmative finding, did he? I think he did, Your Honor. There is a sentence in his, excuse me. My impression was the same as Judge Thomas's for whatever it's worth, that he said something like the same evidence suggests not that he made a finding. If you'll look to page seven of Judge Levy's order, about halfway down the page, you'll find it. If you need four people to verify it, I've looked at it, too. I'm looking for another spot where another statement was made. Well, Counsel, I think you can see, though, that there was no evidentiary hearing on this question. It was decided on summary judgment, and the statements in Judge Levy's order reflect his view of the records in the file without an evidentiary hearing. Well, you're right, Your Honor. There was no evidentiary hearing in this case. However, there was plenty of documentary evidence. But here's my question on that point. If the question of perjury versus false evidence is important, and I'm not sure that it is, but if it is important, why wasn't the defense entitled to an evidentiary hearing on it? We received this on summary judgment where the inferences have to be drawn in favor of the defendant. And essentially what I see the district court doing is saying, well, the evidence strongly suggests, which says to me that the district court is weighing evidence on summary judgment. So explain to me why you don't, if that issue is important, why wasn't the defense entitled to an evidentiary hearing on that? Well, just backtracking, Your Honor. Again, I think there is another portion of that opinion in which he does come out and say more clearly that James did not know of the deal at the time he testified. And if that is supported by the documentary evidence, then there is no need for an evidentiary hearing. Right now what we have is a record showing that Van Oss said he didn't tell James of the deal. James provided a declaration that said no one told him of the deal. James's own attorney has no input on the matter. And so, therefore, if you had an evidentiary hearing, what new would have been provided? I mean, you would have the testimony of James, who had testified the same thing as his declaration. You would have Van Oss, who testified that I don't remember telling James anything and I'm sure I didn't tell James anything. And you have James's attorney, who still didn't know anything. So at this point, an evidentiary hearing would not do Petitioner any good. How do we know that without discovery? All we have are declarations filed by one side on summary judgment. We have no discovery on the issue. It seems to me if we're to draw inferences in favor, and I'll grant you that the inferences you're suggesting, but at summary judgment, the inferences go the other way. So why under that low threshold isn't he entitled to an evidentiary hearing? Well, again, Your Honor, I go back to the position that I think that the district court's order does show a finding of fact. And if this Court disagrees, then perhaps an evidentiary hearing is required on that issue. Well, I don't recall him making a finding on it. If there is a finding and you can tell us where it is, that would be helpful to me. You know, either now or in a supplemental something, if the Court permits it. Well, let's assume that he didn't know. Nonetheless, the prosecution left the false impression not only that he didn't know of a deal, but that there, in fact, wasn't one. So what is your view of what we should make of the prosecutorial misconduct in this case? What should we do with it? I'm glad you asked me that question, Your Honor. I'd like to take a step back, because even though I said that if there was no finding of fact, then perhaps an evidentiary hearing is required. However, I neglected or I forgot to mention that because the magistrate judge and the district court assumed that there was a deal and made their analysis that way, they also reached the materiality issue. And the materiality issue, even if James had lied, it would be immaterial. In this case, under even the NAHU standard. How could that be? I mean, why does a prosecutor cut a deal like that and then keep it secret and then go into court and affirmatively elicit testimony designed to put before the jury a witness who has not been offered a deal? Why doesn't that? Isn't that an absolute corruption of the process? That is reprehensible conduct, Your Honor. And I believe that. And because it's not material, because there's no way to link anything directly to this witness, the prosecutor gets away with it? Is that the state of due process? I think that the state of the law is that unless you establish materiality, you do not establish a violation in NAHU. And I think that Will Hoyt versus Vasquez shows that. There they found no prosecutorial misconduct. Even this Court. Two didn't. But Judge Trott very vigorously, as a former prosecutor, pointed out the perniciousness of it. And now we have another instance of it. Well, Judge Trott also pointed out that. And now we have an embankment. We're not bound by Will Hoyt. It's an embankment court. That's true, Your Honor. But just to continue on that thought, Judge Trott also noted that even though prosecutorial misconduct was reprehensible, it did not change the materiality analysis. And that's what I was getting at. Well, I have a real problem with that. Because I used to prepare witnesses, not in criminal cases, but in my communication with witnesses, I had lots of discussions with them about what was going to happen when they were called up before a jury and the like. Now, how are we supposed to sit here and know whether and what went on in the conferences between James's attorney and James? Maybe he didn't get told directly that there was a deal, but there are lots of ways that testimony can be influenced before somebody comes on the stand. Why isn't that enough? You know, why isn't that the closest thing, if not actual structural error in this kind of a trial? Well, this Court, at least the three-judge panel from this Court, indicated that that is not enough. In Phillips v. Woodford, there they analyzed the claim under as to whether or not such a scheme would constitute pernicious conduct which would infect the integrity of the entire trial. They referred to the Breck footnote 9 error. And even though they assumed that the witness had perjured himself and they assumed that the prosecutor had perjured himself, they said that this did not constitute that type of error. Didn't they apply the wrong standard of materiality when they did that? I'm sorry, Your Honor. Didn't they apply the incorrect standard of materiality when they did that? They applied a reasonable probability test, but NAPU itself applies a reasonable likelihood test. I was speaking of Phillips. But if you mean the majority of the... Are you talking about materiality? You mean the two-judge panel in this case? Right. Okay. They would, it would have been the wrong test if they found that James testified falsely and the prosecutor knew or should have known that he testified falsely. And it wasn't clear from the majority opinion that that's what they found. Well, you know, we were talking about earlier that the district court's finding and you're saying that the district court made a finding, which we would review for clear error, and several members of this panel are saying that, no, it didn't. It would be really helpful if you could find that site, because the panel majority actually says twice that the district court found that James was unaware of the deal when he testified at Hayes' preliminary hearings and trial. This finding is fairly supported by the record. So the panel majority thought there was a finding. That's right, Your Honor. And I'm... But I don't know where that comes from. Counsel, on both page 6 and page 7 of the district court's findings, that suggests strongly language is used in both places. Did the magistrate judge make a finding that was adopted by the district court? Not as to that, Your Honor. On page 8, the district court does make a finding that the magistrate judge does say that evidence of the side deal would not have been probative of James' credibility because James was unaware of the deal. So there the strongly suggests language does seem to drop out of the district court's opinion. That's probably where the majority had focused on. So, and that was the basis for our argument that there was a finding, a fact. Well, on materiality, looking at the special circumstance of burglary, what we have, I think, in the record is this. James and Hayes disagreed about who did burglary. And the only independent witness aside from James was Ms. Wyatt, who saw James carrying a box of cigarettes or looked like he was moving out and putting stuff in the car. So why isn't it enough to discount James' testimony to say it would have likely, it would have affected the outcome on the conviction of burglary, which was the special circumstance? Well, I'd like to answer that question, Your Honor. I'd like to backtrack a little bit and say that in addition to, there was a lot of cumulative evidence impeaching his testimony, James' testimony. He was given transactional immunity for this. The jury was well aware that he had cases pending for two years. So there was a big inference that he was going to benefit for testifying for the prosecution. And as far as the materiality, there is evidence, and counsel is incorrect in saying that there is no evidence that Ms. Wyatt saw Hayes carrying a box towards James' car, because there is, and I refer to R.T. 2671-72 and 2674. She also saw later, saw James carrying something to the car. But it was not a box. When questioned about what she saw, she saw him carrying either a jacket or a sweater. She said it looked like he was moving out, right? When asked for clarification, what did you mean, she said, I don't know what I meant. And she referred to a sweater or a jacket. And as far as the testimony of Michelle Gebbert, there's no evidence that she was a common-law wife. That was never introduced to the jury. The only evidence the jury heard was that James was her boyfriend at one point, and that's it. There was evidence that they drove around prior to going to the police, but James explained that. He explained that he was already in trouble with the police. He didn't want to get involved, and it was Gebbert that pressed him to go to the police, and she finally talked him into it. I'd like to come back to a point you made before you went into the evidentiary points. Now, as you said, the jury was aware of the transactional immunity in the two-year hiatus. But, in fact, the jury was also affirmatively made aware through the prosecutor's questions that there was no deal. That's right. That's false. And, therefore, instead of having simply a witness who's been put on the stand subject to impeachment and inferences the jury might draw, the jury might think there was a deal. And so the prosecutor elicited a false statement. Even if the statement reflected the true state of mind of James, nonetheless, it reflected basically vouched for his credibility by saying, this is a guy who's sitting up here without a deal, leaving us to then speculate what goes on behind the scenes. How might it or did James not really know how was his testimony being influenced by his lawyer? That was the point I was raising earlier. And I find that to be extremely difficult to have a trial put in those, with that cast where we then have to sit reviewing it after the fact and try to figure out, well, was there really any prejudice here? Was there any material? Was it material? Your Honor, up to this point, there is no rule that says or that compels the conclusion that a type of pernicious scheme where you hide the truth from the witness about a deal is itself unconstitutional. And if this Court is going to go in that direction, then I would argue that Hayes is denied relief in his claim based on Teague v. Lane, because I don't think any of the two exceptions would apply to this case. Well, the Supreme Court's literal language in Napue seems to recite, I realize the facts there involve perjury, but the rule the Supreme Court stated seems to be, if I recall it right, that it's a due process violation for the prosecutor to put on false testimony, to knowingly present false testimony, including perjured testimony. But it says including perjured testimony. So why doesn't Napue cover that? Why doesn't Napue cover what the prosecutor did here, taking Teague out of the picture? Napue argued – I think the language in that case was that the prosecutor cannot knowingly put on false evidence, including false testimony. So in reading that, it appears that Napue was referring to – referring to false evidence, referring to both physical as well as testimonial evidence, and it includes false testimony. If a case only has testimony as evidence and that testimony is not false, then how could it be false evidence? I don't have my copy of that opinion with me on the bench here, but I thought it talked about false evidence including perjured testimony. I believe the language is including false testimony. I want to pick you up on what you just said, and I'm not sure I understood it. Are you saying that false evidence was not put on in this case? Your Honor, I'm saying that false testimony was not put on. You're saying that the testimony was not false? That's right, Your Honor. Even when the question is – this is now redirected by Mr. Van Oss, questioned by Mr. Van Oss. And would you tell the jury what, if anything, of any deals or any promises or anything else that has been made in regards to this charge – to this charges? I've got to read what's here. This question does not say promises to you. It says any promises and so on. Answer, no, they still pending, you know, and then it goes on to say no. That is to say, this was not a question on this set. Has anything happened to you? This is a question, have there been any? And the answer is no. He has previously lied to the judge. He has said to the judge there has been absolutely no negotiation whatsoever in regards to his testimony. No promises, no discussions about this or other offense at all. Next page, he's still talking to the judge. He's now backing up his earlier statement. This was asked of Mr. James at the time of the preliminary examination. He testified there had been absolutely no promises, no discussions. In other words, he is relying precisely on that question and on that answer, done at the preliminary and now done again at trial, to support the lie he gives to the judge. Why is that not false evidence? Well, Your Honor, again, I refer back to Wilhite v. Vasquez, very similar situation in which part of it was disclosed. Excuse me, Your Honor. Well, we're not bound by Wilhite. So could I ask the question in a little different way? If you were you are essentially asking us as a non-bank court to approve the practice of prosecutors negotiating a deal with counsel and not telling the client. Well, Your Honor. So that the client can testify that there was no deal. Your Honor, even when there is no deal. Aren't you? Let me backtrack. Aren't you asking us to approve these kinds of secret negotiations? Isn't that the real bottom line? I think this Court can disapprove of such negotiations and still apply the materiality test, which is ultimately. Well, but I understand that that's your – that's a fallback position. But suppose that we – but don't you really want us to approve this kind of practice? Your Honor, I think this Court can say that it does not approve of this kind of practice but still say that Hayes is not entitled to relief under Teekers. So you're conceding that this is not a good practice, that we should disapprove it? I do not think it's a good practice, but I do not think it constitutes a constitutional violation by itself. Counsel, let me ask you about that. I don't know if materiality is quite the right question. We have a case called United States v. LaPage, and in that we quoted extensively from the Supreme Court's decision in Napiew v. Illinois. In Napiew, the Supreme Court said a conviction through the use of false evidence known to be such by representatives of the State must fall under the 14th Amendment. And then we go on, interpreting Napiew, to say that we have to reverse unless the false evidence is proven to be false by representatives of the State. Now, that's a reasonable doubt, just the standard Chapman analysis. So instead of a materiality question, it's Chapman analysis, harmless beyond a reasonable doubt. Now, my thinking is the kind of deal necessarily leads to the putting on of false evidence known to be false by representatives of the State. When there's a deal between the prosecutor and the defense attorney that is not communicated to the defendant, its whole purpose is so that the defendant can say without perjuring himself, there is no deal, when the prosecutor knows that there is. So it's knowingly putting on false evidence. And that would seem to lead to the conclusion under Napiew and LaPage that we have to apply Chapman analysis. We have to reverse because it's a due process violation unless the false testimony was harmless beyond a reasonable doubt. Tell me if there's something wrong with my logic here. Well, the materiality test under Napiew is reasonable likelihood that it would affect the jury's decision. Isn't it reasonable likelihood that it could affect the jury? Isn't that what they said? That's right, Your Honor. No, it's different. Oh, I'm sorry. Reasonable likelihood that it could. And I thought that there was some suggestion that that means the same as the Chapman standard. That's right. There is case law that says that. So aren't we right at Judge Kleinfeld's question then? Don't we have to reverse unless we can say that this testimony, putting this false testimony on, was harmless beyond a reasonable doubt? Well, I would now refer the Court to my argument in the appellee's brief in which I cite Gilday v. Callahan. In that case, the Fifth Circuit determined that for cases that have alleged Napiew error, you still have to apply the Brecht standard for harmless error in a habeas corpus context. And this Court has never directly addressed that issue. Also, as far as Will Hoyt, I understand that this Court is not bound by Will Hoyt. But as I was briefing this case, I had relied on Ninth Circuit authority and had not cited Teague. I believe that if this Court is going to overrule Will Hoyt, then the Teague v. Lane analysis does apply because it does not give a ---- Are you seriously suggesting that the knowing presentation of material false evidence by the prosecution does not constitute a due process violation? That this is new in American jurisprudence? No. What I argue is new is that if a person testifies truthfully ---- No, because I think the ---- getting back to Judge Fletcher's point, I think we're all conceited that this was false evidence. It was not true. And I understand you're arguing about materiality that's separate. Why are you drawing a distinction between the presentation of false evidence, knowing use of material false evidence by the prosecution, whether it's documents, whether it's testimony, whether it is any form of evidence, and the contrived use of testimony so it doesn't appear perjurious to that witness? Why is there a distinction? Again, I'll just go back to my argument that if this Court is going to set a rule that says that that by itself is a constitutional violation, then that would be new. The materiality analysis still applies. And for the arguments that I've made, this change was not a critical witness. The California Supreme Court said it. The magistrate judge said it. District court judge said it. As far as him making Hayes eligible for the death penalty, even Mr. Tolman in his closing remarks said that even if you believe James, you can believe there was a burglary, but that gives you no evidence of the felony murder based on felony burglary. So and in supporting the circumstances for felony murder, the courts have never referred to either James' testimony or Gerber's testimony. So that was just not critical for the death penalty determination. If we get to the materiality question or the harmless error question, and assume we don't adopt a Fifth Circuit standard that says we have to apply Brecht, so we don't use reasonable probability, we use any appreciable likelihood or, you know, harmless error basically, do you then concede that we have to reverse, or do you argue that this error would be harmless? I would argue this error would be harmless. What are the main points of that argument? The main points are that essentially what James testified to was that Mr. Hayes was off the manager, he looked for money, and thereafter when he went back to his car, cigarettes were in his car that were placed there by Hayes. Michelle Gerbert also testifies that Hayes told her that he had ripped off the office and that he didn't have to worry about anyone calling because Patel would not be saying anything to anybody. I should mention that Habeas Counsel argued that Michelle Gerbert vacillated in what she told or what was told to her. She was confused as to who told her about the cigarettes, but she was not confused at all when Hayes initially told her that he ripped off the office. Let me ask you this. The question as to whether or not this is a death-eligible case is not as to whether there was a burglary, but when the plan to do the burglary was arrived at. So if the killing took place and then the plan for the burglary arose, that's not burglary that makes it death-eligible. So the key question is, did Mr. Hayes have in mind the burglary before or during the killing, or did it come up only afterwards? And there's a fair amount of evidence that if you start disbelieving James, that from which a reasonable jury could conclude that this was an after-the-fact plan. For example, James says, I got out to the car, the first thing I see, and the first time I see them, I see the cigarettes in the back seat. Yet Ms. Wyatt, a witness you otherwise rather like, testifies that when she sees James, when she sees Hayes walking across the parking lot with a box, James is standing next to his car. In other words, James is lying if we believe Wyatt. Well, there was some conflict between Wyatt's testimony and everybody else's. Right. But as soon as you start disbelieving James, and then you start asking, well, when did they decide to do the burglary, then you realize, oh, oh, you know, James probably was in on the burglary. And if James was in on the burglary, does that mean he was in on the murder? There was no good testimony that he was in on the murder. That suggests, and I think a reasonable jury could believe, well, you know, after Patel was dead, Hayes comes over to James and says, hey, you know what, let's go into the office. Well, that's open now. One of the strongest pieces of evidence for James' credibility is the prior statements. And he did make prior statements both on January 6th and on January 16th. When he knew he was in trouble. Well, Your Honor, he was never told that he was a suspect in this case. He made those statements, and the deal that's recorded in the notes did not occur until February 17th. That deal did not occur until after the statements were made. The first statement was made before James was even arrested on these other pending charges. He was arrested on the 8th of January and on 16th, and he was arraigned on the 17th. And the magistrate judge said that there was no indication. The inference of the deal that was run by the magistrate judge referred to a deal that occurred no earlier than January 17th. At the time that James was arraigned on his January 16th arrest. And didn't the jury also have before it at the guilt phase the unrebuttal testimony, the M.O. of Mr. Hayes in similar prior robberies or burglaries where he had basically done the same thing to his victim? That's right, Your Honor. He was charged with, subsequently charged with an assault on James Cross. He came upstairs after hearing a lot of noise. James, excuse me, Hayes pushed or pulled Cross into his apartment, pistol whipped him, took money from him, tied him up, then ordered his then girlfriend to go down to look for additional money. And it was reasoned that those circumstances showed that Hayes could form the intent to commit burglary prior to or during an assault on another individual, which was this case. Your time has expired. Thank you, Your Honor. I'd like to readdress one point on Nepew and the false evidence versus false testimony issue. Nepew clearly states false evidence, and that has always been the case, dating back to Mooney in 1935. But one of the reasons why it's not relevant here, whether James knew or not, is the issue that was framed by the Supreme Court in Nepew was, and I'll read it to you, the question presented here is whether on these facts the failure of the prosecutor to correct the testimony of the witness, which he knew to be false, denied Petitioner due process of law in violation of the 14th Amendment. But does that give rise to a per se reversal? Don't we still have to look at the materiality problem? It seems to me you're collapsing a two-part test into one, if we accept your view. If there's false evidence, then there is a 14th Amendment violation if there is a reasonable likelihood that it might, underscore might, see the Bagley opinion, that it could, underscore could, see the Giglio decision, affect the jury. But still, you agree it's still a two-part test? Two-part. Okay. And it's a strict standard of materiality with a very low threshold and a very high degree of grave doubt that it impacted the jury because it involves a corruption of the truth-seeking process. Counsel, did the district court apply the right standard here? I'm looking at page 7 of the district court's findings. This is where we have the conversation about the suggest strongly. And in that same paragraph at the bottom of page 7, the district court says that there is a reasonable probability, and then restates a reasonable probability is a probability sufficient to undermine confidence in the outcome. That would not be the correct standard. Is that right? Reasonable probability is the correct standard on a Brady violation. On a Brady violation, but not here. There is a Brady violation here as well. Right. But we don't need to get that if we think that there's a problem here under NEPU. Correct. That's the wrong standard. Okay. So has the district court applied the wrong standard here? Wrong standard for the NEPU violation, yes. For the NEPU violation. Absolutely. Thank you, counsel. Your time has expired. The case is submitted for decision. The court for this session stands adjourned.
judges: Schroeder, Kleinfeld, Thomas, Graber, Wardlaw, W. Fletcher, Fisher, Gould, Paez, Tallman, Bybee